# EXHIBIT A

William J. Edelman (SBN 285177)
**MILBERG, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (771) 474-1121
wedelman@milberg.com

*Attorneys for Plaintiff and Proposed Class*
*(Additional Counsel on Signature Page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCOJOSE DIVISION**

| | |
|---|---|
| AUSTIN BEAULIER, individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBLOX CORPORATION,<br><br>Defendant. | Civil ActionCase No. 35:26-cv-02642-B<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Austin Beaulier ("Plaintiff") brings this first amended class action complaint ("Complaint") on behalf of himself and all others similarly situated (the "Class Members") against Roblox Corporation, (" ("Roblox" or "Defendant" or Roblox)") for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202. The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to himself and his own actions and counsels' counsel's investigation, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE ACTION

1. This is a nationwide class action for violations of § 1202 of the Digital Millennium Copyright Act ("DMCA").. The case arises from Defendant's Roblox's intentional removal or failure to preserve of machine-readable copyright management information ("CMI"), including: creator attribution and license designation associated with works created by independent artists and designers when those works were copied and processed for use in training large-scale generative artificial intelligence ("AI") systems. That information was not incidental to the works. It was carried inside the model files Roblox copied and in the dataset records Roblox loaded to obtain them. Its absence from Roblox's training data reflects a decision about which fields to keep, not an unavoidable byproduct of file conversion. Plaintiff's claim is an input-stage claim: it concerns CMI removed from copies of existing works before any model was trained, not the content of any output.

2. This action arises from the large-scale commercial exploitation of millions of digital three-dimensional ("3D") models created by independent artists and designers and shared online under Creative Commons licensing terms. These works were collected through automated web-crawling tools and aggregated into massive machine-learning datasets, including the widely used Objaverse-XL dataset, which contains more than ten10 million 3D assets sourced from publicly accessible repositories such as Sketchfab, Thingiverse, Polycam, and GitHub.

3. These datasets were assembled by collecting millions of user-generated 3D models that individual creators uploaded to online repositories under various Creative Commons licenses. Those licenses permit reuse only under specific conditions established by the creators, including requirements

that downstream users provide attribution, restrictions on commercial exploitation, limitations on derivative works, and other conditions governing the permitted use of the works.

4. This case is not about challenging generative artificial intelligence research as a whole~~.~~ ~~Rather, large~~, and it does not assert a claim for copyright infringement. It asserts a claim under 17 U.S.C. § 1202(b)(1) on an input theory: that Roblox removed CMI from copies of existing works before using them to train its models. When a technology ~~companies may not ingest~~company copies Creative Commons-licensed works into an AI training ~~pipelines and deploy~~pipeline, it may not strip those copies of the ~~resulting generative systems in commercial products~~information that identifies the works' creators and ~~platforms without complying with~~the terms on which they may be used, knowing that doing so will enable and conceal uses the license conditions ~~that governed those works when they were originally published~~do not permit.

5. ~~Defendant's~~Roblox's conduct follows a common structural pattern. First, individual creators upload original 3D models to online repositories such as Sketchfab and Thingiverse under Creative Commons license terms that preserve attribution rights and impose other conditions on reuse. Second, researchers and dataset curators aggregate links or directives to those models into large-scale training datasets such as Objaverse-XL. Third, ~~commercial technology companies use those datasets~~ Roblox loaded the datasets' per-object records—which state each work's source, creator, license, and file identifier—to identify and ~~download~~retrieve the 3D models. Fourth, ~~commercial technology companies prepare and render~~Roblox parsed the downloaded ~~3D models~~ model files, stripped from those copies the creator, license, title, and source information they carried, and carried the works' geometry forward into its training data. It then rendered the works for ingestion into its generative AI models~~ while stripping the models of CMI.~~. Finally, ~~those models are~~Roblox integrated the resulting models into its monetized ~~consumer and enterprise ecosystems~~ecosystem, allowing ~~companies~~it to generate revenue from systems trained on the works of ~~millions~~thousands of creators.

6. By ingesting Creative Commons-licensed works into commercial AI training pipelines ~~without preserving~~after stripping them of their attribution information, without complying with license conditions, and without authorization from the creators whose works were used, ~~Defendant~~Roblox has

exploited the openness of the online 3D-model community while disregarding the legal obligations that govern the reuse of those works.

7. The conduct alleged here reflects a broader systemic practice in which commercial entities build generative AI systems by ingesting large-scale datasets derived from online creative communities while disregarding the licensing conditions governing those works.

8. Importantly, the creators whose works were incorporated into these datasets are not anonymous or unknowable. Unlike certain web-scraping contexts in which the origin of training data is difficult to determine, the Objaverse-XL dataset itself preserves links to the original source files and creator accounts from which the models were obtained. This makes it possible to identify with precision the artists whose works were incorporated into the datasets used to train generative systems. For each Sketchfab-sourced work, the dataset's records identify the work's title, its creator's username, display name, and profile URL, the license the creator selected, and the URL of the work's page on Sketchfab. The model files themselves carry the same information—title, creator and profile URL, license and license URL, and source URL—in their headers.

9. The Copyright Clause of the United States Constitution empowers Congress to protect works of human creativity. These protections encourage creators to devote effort and resources to creative enterprises by providing confidence that their works will be shielded from unauthorized exploitation.

10. In recognition that emerging technologies could be used to evade statutory protections, Congress enacted the ~~Digital Millennium Copyright Act~~DMCA in 1998. Among other things, the DMCA prohibits the intentional removal or alteration of copyright management information associated with a protected work when the actor knows, or has reason to know, that doing so will induce, enable, facilitate, or conceal infringement.

11. Plaintiff brings this action to enforce those rights and to ensure that creators whose works were incorporated into ~~Defendant's~~Roblox's generative AI systems are afforded the protections guaranteed by federal copyright law.

12. Roblox entered the generative 3D market through the release of its Cube 3D system in March 2025, a model designed to generate 3D assets for use within its online gaming platform. Roblox

has since built on the same model, releasing an updated version in July 2025, in-experience "4D" generation in 2026, and a part-controllable generator, CubePart, in May 2026.

13. Roblox has publicly disclosed that Cube 3D was trained on a large dataset of approximately 1.5 million 3D assets, including materials derived from Objaverse-XL.

13. Roblox has publicly disclosed, in the technical report accompanying Cube 3D, that it trained the model's shape tokenizer on "roughly 1.5 million 3D object assets" drawn from "a combination of licensed and public available [sic] datasets" (e.g., Objaverse), together with free assets from Roblox's own Creator Store "that are opted in for training."[1] Objaverse is a collection of approximately 800,000 works that researchers gathered from Sketchfab. Each is distributed as a model file that carries its creator's name, its license, its title, and its source address inside the file. By describing "licensed" datasets and "public available" datasets as distinct sources, Roblox's report does not represent that the Objaverse works were licensed to Roblox. Nor does the report identify the creator, license, or source of any Objaverse work Roblox used, although that information accompanied every one of them.

14. Roblox explicitly integrated Cube 3D directly into its developer ecosystem through a Mesh Generation API, enabling users to automatically create 3D assets within a platform that generates substantial revenue through user-generated content. Roblox also released the model's weights and inference code to the public on GitHub and Hugging Face, and operates a public web demonstration through which anyone can generate and download 3D models.

15. Roblox, in training its AI systems through ingestion of In preparing the Objaverse-XL derived works, removed and/or failed to preserve for training, Roblox stripped from the copies it obtained the CMI associated withthat accompanied those works when published, including creator attribution and licensing terms. Roblox further distributed, and used the CMI-stripped works through its revenue-generating AI copies to train Cube 3D, a commercial system it has deployed across its platform. and released to the public. In so doing, Roblox has violated the DMCA.

---

[1] Roblox Foundation AI Team, *Cube: A Roblox View of 3D Intelligence*, (Mar. 19, 2025), available at: https://arxiv.org/abs/2503.15475 (the "Cube Report"), § 2.4.

## JURISDICTION AND VENUE

**A. Jurisdiction**

16. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Copyright Act of 1976, 17 U.S.C. § 101, et seq., as amended by the Digital Millennium CopyrightDMCA, 17 U.S.C. § 1202 et seq.

17. This Court has personal jurisdiction over Roblox because DefendantRoblox resides in this District, maintains its principal place of business in this District, conducts substantial business in this District, and has purposefully directed the conduct alleged herein toward this District.

18. Upon information and belief, Defendant Roblox maintains its headquarters at 3150 S Delaware St, San Mateo, CA 94403 within this District.

19. DefendantRoblox has purposefully availed itself of the privilege of conducting business within this District and has derived substantial revenue from its activities directed at residents of this District and throughout the United States.

**B. Venue**

20. Venue is proper under 28 U.S.C. § 1391(b)(1) because DefendantRoblox resides in this District.

21. Venue is further proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. DefendantRoblox developed, trained, and/or deployed generative artificial intelligence systems within this District that were trained using datasets containing Plaintiff's copyrighted works and associated copyright management information.

22. DefendantRoblox conducts substantial business in this District and regularly engages in interstate commerce within this District.

23. Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because DefendantRoblox is subject to personal jurisdiction in this District.

## PARTIES

**A. Plaintiff**

24. Plaintiff Austin Beaulier is an individual and a professional 3D artist, developer, and visual effects creator residing in the Los Angeles, California area.

25. Plaintiff specializes in creating digital three-dimensional models, photogrammetry scans, and other visual assets used in animation, visual effects, virtual environments, and related digital media applications.

26. Plaintiff has more than eight years of experience producing photorealistic 3D assets and working with advanced 3D modeling, scanning, and machine-learning technologies.

27. Plaintiff publishes and distributes original 3D models and related digital works through online platforms used by the global 3D artist community, including repositories such as Sketchfab, CGTrader, Thingiverse, and Polycam, and other digital asset platforms.

28. Plaintiff owns the copyrights and other exclusive rights in his original 3D works that he created and published online.

29. Plaintiff's original 3D works are included in Objaverse—the dataset Roblox names as a source of Cube 3D's training data—and in its successor, Objaverse-XL, and related derivative datasets~~,~~ used to train ~~Defendant's~~Roblox's AI systems.

30. Plaintiff brings this action individually and on behalf of a class of similarly situated creators whose 3D models and works were incorporated into large-scale AI training datasets used to train ~~Defendant's~~Roblox's generative AI systems.

B. **Defendant**

31. ~~Defendant~~ Roblox Corporation is a corporation organized under the laws of the State of Delaware with its headquarters in San Mateo, California.

32. Roblox operates a large online gaming and virtual-world platform that allows users and developers to create, distribute, and monetize interactive digital experiences and virtual assets. Roblox has publicly disclosed developing generative artificial intelligence systems designed to create three-dimensional digital assets for use within its developer ecosystem and gaming platform. Those systems

include Cube 3D, a foundation model for 3D generation that Roblox released in March 2025 and has since deployed in Roblox Studio, inside Roblox experiences, and as a publicly downloadable model.

## FACTUAL ALLEGATIONS

### A. The Online 3D Model Creator Ecosystem

33. Over the past two decades, a large online ecosystem has emerged in which artists, designers, engineers, hobbyists, and developers create and share digital 3D models. These models are used across numerous industries and creative fields, including video game development, animation, virtual and augmented reality environments, product design, architecture, robotics, and additive manufacturing.

34. A substantial portion of this ecosystem operates through public repositories that allow creators to upload and distribute their works to others. These repositories include platforms such as Sketchfab, Thingiverse, Polycam, and other web-based archives that host user-generated 3D content.

35. These platforms collectively host millions of digital 3D models representing a wide range of objects, including characters, vehicles, architecture, mechanical components, and natural environments. Individual creators invest substantial time, skill, and creative effort into producing these models using specialized design tools and software.

36. The online ecosystem for sharing and distributing digital 3D models has thus developed around open licensing frameworks that allow creators to share their work while retaining specifically defined legal rights.

37. Many creators choose to share their works publicly in order to contribute to collaborative design communities, build professional portfolios, and allow other artists and developers to reuse their work in legitimate creative projects.

38. To facilitate lawful sharing while preserving creators' rights, these platforms commonly require creators to select a license governing how their work may be reused by others. In the 3D-modeling ecosystem, those licenses are frequently Creative Commons licenses. The models identified through datasets such as Objaverse-XL are not governed by a single uniform license.

39. These Creative Commons licenses serve two complementary purposes. First, they allow creators to share their work freely with the broader community in the spirit of collaborative creativity and open innovation. Second, they preserve core protections that allow creators to maintain recognition and control over how their works are reused.

40. In general, Creative Commons licenses commonly require downstream users to comply with obligations such as providing attribution to the creator, refraining from commercial exploitation, or distributing derivative works under the same licensing terms.

41. More specifically, where works are licensed under CC-BY (Attribution), the work may be reused provided that the original creator receives proper credit. CC-BY 4.0 requires that attribution information associated with the work be preserved and communicated when the work is reproduced or reused. Where works are licensed under CC-BY-NC (Non-Commercial), commercial use is prohibited. Where works are licensed under CC-BY-SA, derivative works must be distributed under the same licensing terms as the original work. Each of these licenses imposes distinct obligations on downstream users of the work.

42. None of these licenses authorizes the removal of CMI. The Creative Commons Attribution 4.0 license conditions every reuse of a licensed work on retaining, if supplied by the licensor, "identification of the creator(s) of the Licensed Material," "a copyright notice," "a notice that refers to this Public License," and "a URI or hyperlink to the Licensed Material," and on indicating that the work is licensed under that license. CC BY 4.0 § 3(a)(1). Its Non-Commercial and Share-Alike variants carry the same attribution conditions. Upon information and belief, Sketchfab's Standard license, under which many Class Members' works are published, likewise does not authorize removal of the creator-identifying information or license terms that accompany a downloaded model: it requires the licensee to retain the Licensor's name and "any other information as may be embedded in the electronic file," and, in certain audio/visual productions, to credit the Licensor.[2] And Sketchfab's "NoAI" designation, described below, withholds permission for the use to which Roblox put the works altogether. Whatever

[2] Sketchfab, License Agreement §§ 3.2, 12, available at: https://sketchfab.com/licenses.

else these licenses permit, none permits a licensee to strip from a work the information identifying its creator and the terms of its use.

42.43. Importantly, these licenses operate on a per-work basis. When a creator uploads a model to platforms such as Sketchfab or Thingiverse, the creator selects the specific license governing that particular work. As a result, two models hosted on the same platform may be subject to entirely different licensing conditions depending on the choices made by their creators.

43.44. Because these requirements are attached on a work-by-work basis, users of large collections of 3D models must preserve and track attribution, license designations, and related CMI for each individual asset if they intend to comply with the governing terms.

44.45. This structure presents significant compliance challenges.requires per-work tracking, which is feasible at scale. When a system relies on hundreds of thousands or millions of individual models originating from multiple platforms and governed by different license terms, compliance with attribution and licensing requirements requires tracking and preserving CMI on a per-work basis.

45.46. Upon information and belief, DefendantRoblox's pipeline did not maintain a system capable of tracking, preserving, and reproducingtrack or carry forward the attribution and licensing information required by these licenses on a per-work basis throughout, even though, as alleged below, Roblox maintains per-item permission records for the process by which the works were copied, converted, rendered, normalized, and ingested into AI training inputsdata it draws from its own platform and represents that it can locate and remove such items from its training dataset within thirty days.

46.47. Defendant'sRoblox's practices madedefeated compliance with the licensing requirements governing those works effectively impossible.. For example, where a work was licensed under CC- BY or CC- BY 4.0, the license required that the user provide attribution to the creator when the work was reproduced, distributed, or otherwise used. Yet Defendant'sRoblox's training pipeline incorporated large numbers of works into machine-learning systems without preservingafter stripping out the identity of the creators orand the licensing information associated with each work.

47.48. Where works were licensed under terms that restrict commercial exploitation—including CC- BY-NC—using those works to train commercial generative AI systems exceeded the scope of the license granted by the creator.

48.49. Similarly, where works were licensed under share-alike provisions such as CC- BY-SA, the use of those works in downstream generative systems raised further obligations that DefendantRoblox did not attempt to satisfy.

49.50. Defendant'sRoblox's conduct alleged herein created a substantial certainty that works subject to restrictive licensing conditions would be copied, processed, and used in AI training systems without authorization and without compliance with the terms governing those works.

50.51. Defendant'sRoblox's practices undermined the licensing framework that has enabled the collaborative development of the online 3D-model ecosystem.

B. **Sketchfab's NoAI Designation as Copyright Management Information**

51.52. Sketchfab is a widely used online platform that allows creators to upload, publish, and distribute digital 3D models for use in video games, animation, virtual reality, engineering, and other digital media applications. The platform hosts millions of user-generated 3D models created by artists, designers, engineers, and hobbyists who share their works with the broader creative community.

52.53. Sketchfab requires creators who make models available for free download to select a Creative CommonCommons license governing the work.

53.54. In February 2023, in response to growing concerns within the artist community regarding the use of online artwork to train generative artificial intelligence systems, Sketchfab introduced a platform feature known as the "NoAI" tag.

54.55. The NoAI tag allows creators to designate that their models may not be used for generative AI data collection, dataset creation, or AI model training.

55.56. When a creator applies the NoAI designation to a model, Sketchfab embeds a corresponding HTML meta tag within the model's webpage indicating that the work is disallowed for use in generative AI datasets or training pipelines. This tag functions as a machine-readable signal that can be detected by automated tools accessing the platform. On the model's public page, Sketchfab also

displays the designation to human visitors in plain text: “NoAI: This model may not be used in datasets for, in the development of, or as inputs to generative AI programs.” The corresponding machine-readable tag reads: <meta name=“robots” content=“index, noAI”>.

56.57. In other words, the NoAI designation is implemented through machine-readable metadata embedded in the model’s webpage and associated platform data. This metadata is designed to be detected by automated systems accessing the platform and communicates that the work may not be used in generative AI datasets or training pipelines.

57.58. Sketchfab simultaneously updated its platform policies and terms of use to reinforce the significance of this designation. Under those terms, which took effect on March 23, 2023, users are prohibited from using models marked with the NoAI tag in datasets used for developing or training generative AI systems, in the development of such systems, or as inputs into such systems.

58.59. The platform does not apply the NoAI designation automatically. Instead, creators must actively choose to apply the tag to their projects. This design reflects that the tag represents a deliberate decision by the creator to impose a specific restriction governing the use of the work.

59.60. The NoAI designation therefore operates as a creator-imposed restriction governing how a particular work may be used. When applied, it communicates that the creator has expressly withheld permission for the work to be incorporated into AI training datasets or similar automated data-collection systems.

60.61. ThisThe NoAI designation of the type of Creative Common license constitutes CMI within the meaning of 17 U.S.C. § 1202(c). Specifically, the NoAI tag falls under § 1202(c)(6), which covers “terms and conditions for use of the work.” By designating a model as NoAI, the creator attaches a specific usage restriction to the work indicating that it may not be used for AI training purposes.

61.62. Functionally, the NoAI designation operates in the same manner as other forms of digital rights-management information, such as embedded license notices, copyright metadata, or digital watermarks that communicate restrictions on the use of copyrighted works.

62. In copying, converting, and preprocessing the works for use in machine-learning training pipelines, Defendant removed, failed to preserve, or disregarded the NoAI tag.

63. The NoAI designation is conveyed on the work's page on Sketchfab, and the copies and records from which Roblox worked carried the address of that page. The URL of a work's Sketchfab page is recorded within the model file Sketchfab generates for download, and it is recorded in the dataset record that identifies each Objaverse work. A link to a work's copyright management information is itself copyright management information. 17 U.S.C. § 1202(c)(7) ("links to such information"). In copying, converting, and preprocessing the works for use in machine-learning training, Roblox removed that link together with the works' other CMI, severing each work from the designation and terms displayed on its page and leaving no record of the link in the training records it created. To the extent Roblox obtained works directly from Sketchfab after February 2023, it did so through pages that carried the NoAI designation in machine-readable form, and the copies and training records it created kept no record of that designation. Plaintiff applied the NoAI designation to each of his Sketchfab models shortly after February 2023, and, as alleged below, Roblox assembled and processed its Cube 3D training corpus after that date. The designation was therefore displayed on each work's Sketchfab page, to which the URL carried in Roblox's copies and records pointed, throughout that period.

~~63.~~64. Accordingly, the removal~~, alteration, or disregard~~ of the links through which the NoAI designation is conveyed, in connection with copying, downloading, processing, or ingesting Sketchfab models into AI training pipelines, constitutes the removal ~~or alteration~~ of copyright management information within the meaning of 17 U.S.C. § 1202; so too does the removal or alteration of the designation itself, to the extent it was conveyed with the copies Roblox obtained. The NoAI designation is not the only CMI at issue: the creator, title, and license information carried in each file's header independently constitutes CMI, as alleged below.

C. **Copyright Management Information in the 3D Model Ecosystem**

~~64.~~65. The works created by Plaintiff and members of the proposed Class were originally distributed on platforms such as Sketchfab, Thingiverse, and Polycam together with creator-identifying information, licensing information, attribution requirements, and other information governing the permitted use of the works.

~~65.~~66. This information commonly includes the title of the work, the identity of the creator, links to the creator's account or portfolio, the type of Creative ~~Common~~Commons license governing how the work may be used, and associated terms or conditions communicated on the platform page or in associated metadata fields.

~~66.~~67. These data fields, conveyed in connection with copies of the works, constitute CMI within the meaning of the DMCA. Section 1202(c) defines CMI broadly to include, among other things, the title and identifying information of a work, the name and identifying information of the author or copyright owner, and the terms and conditions governing the use of the work.

~~67.~~68. The licensing designations attached to models hosted on platforms—including Creative Commons license selections—therefore constitute CMI because they communicate the terms and conditions under which the work may be reused.

~~68.~~69. This information, including the creator's identity and the terms governing reuse, is commonly conveyed through metadata attached to the work.

70. The CMI described above is not merely displayed near the works on platform webpages; it travels with the works in machine-readable form. When a work is downloaded from Sketchfab, the platform delivers the model as an archive that includes, alongside the model's geometry and texture files, a license file identifying the work's title, its source URL on Sketchfab, its author and the author's profile URL, the governing license and license URL, and the attribution statement required for reuse of the work.

71. Sketchfab embeds CMI within the model file itself. The glTF/GLB model files that Sketchfab generates for download contain, in the file's standard "asset" header, an "extras" metadata block recording the work's title, its author and the author's Sketchfab profile URL, its license and the license URL, and the URL of the work's source page, together with a "generator" field identifying Sketchfab as the creator of the file. A GLB file consists of a text header, in a standard structured format, followed by the binary geometry data. Any software that processes the model must parse that header to locate the geometry. It therefore reads the embedded CMI in the course of loading the file.

72. Carrying attribution and licensing information within a 3D model file is a standard, supported feature of the format in which the works were distributed. The glTF 2.0 specification—the

industry-standard 3D asset interchange format maintained by the Khronos Group—defines a dedicated "asset.copyright" property, described in the specification as "[a] copyright message suitable for display to credit the content creator," as well as an "extras" property that permits application-specific metadata, such as authorship and license information, to travel within the file.[3] Roblox's own systems work in the same format: the public demonstration of Cube 3D delivers generated models to users as GLB files.

73. Machine-learning training data is likewise capable of carrying per-work CMI. A training corpus is a collection of per-work records whose fields are defined by the party that builds the corpus, and per-work provenance metadata routinely accompanies training data at scale. Objaverse itself distributes, for each of its approximately 800,000 objects, a structured record identifying the object's title, its creator, the license the creator selected, and the address of its source page. Objaverse-XL does the same for more than 10 million objects, adding each file's type and a cryptographic content hash (a "SHA-256" hash). Publicly distributed research datasets key additional per-object annotations, such as text captions, to the same object identifiers across more than a million Objaverse and Objaverse-XL objects. And Roblox's own training data carries per-item provenance: as alleged below, Roblox tracks, for each asset it draws from its own platform, whether the asset's creator has permitted its use for training, and Roblox represents that it can remove any such asset from its training dataset within thirty days of a creator's request.

74. Accordingly, preserving each work's creator, title, license terms, and the link to its source page (the means by which any NoAI designation is conveyed) through an AI training pipeline is technically routine. It requires only that the party building the training corpus carry forward, in its own records, machine-readable fields that accompany the works—within the model files themselves, within the download archives, and within the dataset records—at negligible cost. No format used at any stage of the pipeline alleged in this Complaint is incapable of accommodating CMI.

D. **Registration Is Not Required for Plaintiff's DMCA Claims**

[3] *See* glTF 2.0 Specification (Khronos Group), available at: https://registry.khronos.org/glTF/specs/2.0/glTF-2.0.html.

~~69.~~75. Plaintiff and the members of the proposed Class are creators who design, author, and publish original digital 3D models on online platforms. These creators retain copyright interests in their works and routinely distribute their models publicly through these platforms, accompanied by creator attribution information and other CMI identifying the author of the work.

~~70.~~76. A significant portion of these creators, however, have not formally registered their works with the United States Copyright Office. This is consistent with the norms of the online 3D-modeling community, where individual creators frequently publish original works for download, collaboration, or portfolio display without undertaking the administrative burden and expense associated with federal copyright registration.

~~71.~~77. ~~Defendant's~~Roblox's conduct nevertheless gives rise to liability under Chapter 12 of the Copyright Act regardless of whether Plaintiff's works were registered. Claims arising under 17 U.S.C. § 1202 constitute independent statutory violations separate and distinct from claims for direct copyright infringement.

~~72.~~78. Unlike infringement claims under 17 U.S.C. § 501, which are subject to the registration prerequisite of 17 U.S.C. § 411(a), causes of action under Chapter 12 do not require a plaintiff to obtain a prior copyright registration before bringing suit.

~~73.~~79. ~~Defendant's~~Roblox's conduct injured Plaintiff and the proposed Class by interfering with the statutory protections afforded to creators under Chapter 12 of the Copyright Act, including protections designed to preserve attribution information and safeguard digital works from unauthorized copying, processing, and downstream exploitation.

~~74.~~80. As a result, ~~Defendant~~Roblox cannot evade liability for its violations of 17 U.S.C. § 1202 merely because the affected creators had not registered their works with the Copyright Office.

E. **Objaverse, Objaverse-XL, and Related Datasets**

~~75.~~81. In recent years, researchers and technology companies have assembled large-scale datasets of 3D models in order to train artificial intelligence systems capable of generating new 3D content.

~~76.~~82. One of the most widely used datasets for this purpose is Objaverse, and its expanded successor Objaverse-XL, which was released in 2023. Objaverse, released in December 2022, comprises approximately 800,000 3D works that researchers collected from Sketchfab. Objaverse-XL, released in July 2023, incorporates that collection and adds works from other repositories. Roblox's technical report identifies Objaverse by name as a source of Cube 3D's training data.[4]

~~77.~~83. Objaverse-XL is an academic dataset composed of more than 10 million 3D assets collected from publicly accessible repositories containing user-generated 3D models.

~~78.~~84. The dataset aggregates models from numerous online platforms, including Sketchfab, Thingiverse, Polycam, GitHub, and other repositories where creators publish and distribute digital 3D assets.

~~79.~~85. Because the source platforms allow creators to select licensing terms for each individual model, the assets referenced in Objaverse-XL are associated with a wide variety of Creative Commons licenses and other usage restrictions imposed by the creators who authored those works.

~~80.~~86. Objaverse and Objaverse-XL ~~preserves~~preserve references to the original source files, source repositories, and creator accounts from which the models were obtained. These links allow researchers and downstream users to trace assets back to the platform and creator from which they originated. By contrast, ~~Defendant's~~Roblox removed that information from the copies it carried into its curated training datasets ~~and generative systems do not retain or communicate that information~~, thereby severing the connection between the work and the creator.

~~81.~~87. The existence of these links makes it possible to identify the individual artists and designers whose works were incorporated into or referenced by the dataset—which is important for attribution.

[4] *See* Cube Report § 2.4 (identifying Objaverse as a source of Cube 3D's training data); Matt Deitke et al., *Objaverse: A Universe of Annotated 3D Objects*, (Dec. 15, 2022), available at: https://arxiv.org/abs/2212.08051; Matt Deitke et al., *Objaverse-XL: A Universe of 10M+ 3D Objects*, (July 11, 2023), available at: https://arxiv.org/abs/2307.05663.

~~82.~~88. These datasets have been used by commercial technology companies to train foundation-scale generative models capable of automatically producing new 3D objects, environments, and digital assets.

~~83.~~89. Once trained, these systems can produce new 3D assets through automated prompts or programmatic interfaces and can be integrated into commercial platforms, developer tools, and enterprise software systems.

~~84.~~90. Several major technology companies—including Roblox—have publicly disclosed using Objaverse, Objaverse-XL, or datasets derived from ~~Objaverse-XL~~them to train generative 3D models that are incorporated into commercial products, research initiatives, or developer ecosystems.

~~85.~~91. Datasets such as Objaverse-XL function as a structured index of publicly hosted 3D models, preserving references to the online repositories where those works were originally published.

92. Objaverse and Objaverse-XL are distributed as structured indexes together with software that operates on those indexes. For Objaverse, the dataset's official software exposes a per-object annotation record—recording the work's title, its creator's username, display name, and profile URL, the license the creator selected, and the URL of the work's page on Sketchfab—and retrieves the model files from a copy of the collection hosted on the Hugging Face platform. For Objaverse-XL, the dataset's software exposes annotation tables recording, for each object, its source, license, file identifier, and SHA-256 content hash, and its download functions take those records as their input. For works hosted on Sketchfab, each object's file identifier is a URL of the form "https://sketchfab.com/3d-models/{identifier}," which resolves to the work's Sketchfab model page—the page bearing the work's title, creator, license designation, and, where applied, the NoAI meta tag. The Objaverse-XL research paper instructs that "[u]sers must follow the license of the content with which the original files were distributed and the terms of service for each platform."[5] A user of either dataset cannot retrieve a work without the record that states its creator and license.

---

[5] Deitke et al., *Objaverse-XL: A Universe of 10M+ 3D Objects*, (July 11, 2023), available at: https://arxiv.org/abs/2307.05663 (NeurIPS 2023 Datasets and Benchmarks).

93. The model files in the Objaverse collection are the glTF/GLB files Sketchfab generated for download, with the embedded "asset" metadata described above intact. Model files retrieved through the dataset's own software carry the author and license information described above in their headers. Upon information and belief, Roblox obtained the Sketchfab-originated works either from that hosted collection or directly from Sketchfab. By either route, the copies Roblox obtained carried the works' CMI within the files themselves and in the accompanying records.

~~86.~~94. Repositories, such as Sketchfab, Thingiverse, Polycam, GitHub, and others, distribute creator-uploaded models together with CMI, including the creator's identity, licensing terms, attribution requirements, and other information governing the permitted use of the work.

~~87.~~95. Upon information and belief, ~~Defendant~~Roblox used Objaverse-derived datasets as a source map to identify and obtain copies of 3D models. After obtaining those works, ~~Defendant~~Roblox copied, converted, rendered, normalized, and otherwise processed the models through machine-learning preprocessing pipelines. In the course of that process, Roblox removed the creator-identifying information, licensing metadata, and other CMI that accompanied the works when originally distributed ~~were removed, failed to be preserved, or otherwise disregarded, resulting in~~, and Roblox then used the ~~use of~~ CMI-stripped ~~representations~~copies of Plaintiff's works within ~~Defendant's~~its AI training datasets.

~~88.~~96. As a result, the ~~representations~~copies of Plaintiff's and ~~class members'~~Class Members' works ~~used within Defendant's~~that Roblox carried into its generative AI training systems no longer ~~contained~~carried the attribution, licensing information, or other copyright management information associated with those works when they were originally distributed.

**F. ~~Defendant's~~Roblox's Use of Plaintiff's Works for AI Training and ~~Failure to Preserve~~Removal of CMI**

~~89.~~97. Large technology companies, such as ~~Defendant~~Roblox, have incorporated Objaverse, Objaverse-XL and Objaverse-derived datasets into the training pipelines for commercial generative artificial intelligence systems designed to create new 3D models and digital environments.

~~90.~~98. Upon information and belief, ~~Defendant~~Roblox trained its generative 3D systems using assets drawn from Objaverse, Objaverse-XL, or derivative subsets of ~~that dataset~~those datasets.

91.99. The conduct alleged in this action follows a consistent technological pipeline through which DefendantRoblox identified, obtained, and processed Plaintiff's works for use in generative artificial intelligence training systems.

92.100. First, individual creators—including Plaintiff and members of the proposed Class—published original 3D models on online repositories such as Sketchfab, Thingiverse, and Polycam. When those works were distributed on those platforms, they were accompanied by CMI, including the creator's identity, the title of the work, licensing terms governing reuse, attribution requirements, and other information identifying the conditions under which the work could be used.

93.101. Second, researchers compiled datasets such as Objaverse-XL, which aggregateaggregated references to millions of these models and preserved source information sufficient to identify the online repositories where the works were hosted. These datasets functioned as a structured index that enabled downstream users to locate the underlying works on the platforms where they were originally published. These datasets also contain metadata identifying the Creative CommonCommons license, and other terms of use, associated with the work.

94.102. Third, commercial entities useRoblox used those datasets as a source map to identify and obtain the referenced 3D assets from the online repositories where those works were originally hosted, or from copies of those works hosted elsewhere, including the Objaverse collection hosted on Hugging Face.

95.103. Fourth, and most importantly, after obtaining copies of the works, DefendantRoblox processed the models through machine-learning preprocessing pipelines designedthat Roblox built to convert rawcopies of 3D assetsworks into training inputs suitable for generative AI systems. and configured to remove the works' CMI.

96.104. Training generative artificial intelligence systems requires converting rawcopies of creative works into machine-learning representations that can be processed by neural networks.

97.105. In the context of 3D generative models, this process involves transforming rawcopies of 3D assetworks—the model files themselves—into numerical or visual representations that can be used as training inputs. The removal of CMI alleged in this Complaint did not occur in the course

of any such transformation. It occurred before it, when Roblox's pipeline loaded each model file and stripped out the CMI its header carried.

~~98.~~106. This preprocessing typically includes operations such as format conversion, mesh normalization, rendering, voxelization, and other transformations ~~designed to~~that convert the geometry and textures of a 3D model into data structures suitable for machine-learning training. None of those operations requires deleting a file's CMI; deleting it was a deliberate choice Roblox made. In Roblox's case, as described below, the operations Roblox has disclosed are loading each model file, cleaning and normalizing the mesh, sampling points on its surface, and rendering views of it.

~~99.~~107. During these transformations, the creative content of the work—such as its geometry, structure, textures, and visual features—is preserved in numerical or visual form so that the model can learn patterns from the training data.

~~100.~~108. ~~However, during this process,~~As Roblox configured it, however, Roblox's pipeline stripped the works ~~are separated from~~of the attribution information, licensing terms, and other CMI that accompanied ~~the works~~them when they were originally distributed on their source platforms.

~~101.~~109. Thus, the creator-identifying information, licensing metadata, attribution requirements, and other CMI that accompanied the works when originally distributed were removed~~, failed to be preserved, or otherwise disregarded~~.

~~102. As a result, once a work has been converted into machine-learning training inputs, it is no longer possible for the training system itself to identify the creator of the work or to comply with the attribution requirements or licensing conditions associated with that work.~~

~~103. This separation between the creative content of a work and the CMI that accompanied it is a foreseeable and inherent consequence of using large-scale creative datasets to train generative artificial intelligence systems.~~

110. ~~Defendant~~Roblox has described its preprocessing pipeline. According to its technical report, Roblox "center[s] and rescale[s] all assets to lie within a normalized bounding box with each axis ranging from [-1,1]," and, "[f]or each asset within a training batch," samples "8,192 points directly on its surface" as the input to its shape tokenizer, together with additional points sampled in space and near the

surface to compute a training loss.[6] Roblox has also published code that prepares a model file for its shape tokenizer.[7] That code loads the model file with a general-purpose 3D library and instructs the library to collapse the file's contents into a single mesh. It then removes degenerate and duplicate faces and unreferenced vertices, recenters and rescales the vertices, samples 8,192 points on the mesh surface together with their normals, and writes the result as an array of 8,192 rows of six numbers. Nothing in that code reads, stores, or outputs the creator, license, title, or source information the file carried, and that information does not survive the first of those operations.

111. When that code is applied to a Sketchfab-generated model file, the library reads the file's entire header—including the "asset" block that names the work's creator, license, title, and source—in order to locate the geometry. Of that "asset" block, the library uses only the file's format version number. It does not retain the creator, license, title, or source information anywhere in the object it returns. The library carries the vertices and faces forward and, in current versions, a few generic technical fields it supplies itself, such as an assumed default unit of measure and the name of the geometry node, and it strips out the creator, license, title, and source information the header carried. Roblox's instruction to collapse the file into a single mesh additionally discards any scene-level and node-level metadata the file carries, including any CMI recorded there. What emerges from the load step, before any rescaling or sampling, is a copy of the same work minus its CMI. The only material difference between the copy Roblox downloaded and the copy that emerged from that step is that the CMI is gone. Upon information and belief, the pipeline Roblox used to prepare its 1.5 million training assets handled the works in the same way, because Roblox's technical report describes the same operations—centering and rescaling each asset and sampling 8,192 points on its surface—and because the shape tokenizer must receive at training time the same form of input that Roblox's published code prepares for it at inference time.

---

[6] Cube Report § 2.4.

[7] *See* https://github.com/Roblox/cube; https://huggingface.co/Roblox/cube3d-v0.1; https://huggingface.co/Roblox/cube3d-v0.5; https://huggingface.co/spaces/Roblox/cube3d-interactive. The code that prepares a model for the shape tokenizer is published in the repository at cube3d/vq_vae_encode_decode.py.

112. In plain terms, a Sketchfab model file is a digital package with two parts: the shape of the object, and a label on the outside of the package naming the creator, the license, the title, and where the work came from. Roblox has a copy of the original model with its CMI still attached; the label is on the package Roblox holds. The code Roblox published opens the package, takes out the shape, and leaves the label behind. From the shape alone it produces a list of numbers—8,192 points, each described by six values—and that list is what goes to Roblox's AI model. The software that opens the package reads the whole header, label included, in order to find the shape, but nothing in the code keeps the label, copies it into the training data, or writes it down anywhere else. Upon information and belief, Roblox prepares each work for training the same way. Roblox knew the label was there, and it knows how to keep creator and permission information when it wants to: its systems used the creator and license fields of the Objaverse records to find and track the works, and it keeps item-level creator and permission records for the creators on its own platform, as alleged below. The label was not lost because AI training requires losing it. It was left behind because Roblox built a pipeline that carries forward only what Roblox chose to keep.

113. The separation of the works from their CMI was not the product of ignorance of that CMI. Roblox's pipeline operated on the works' CMI in order to build its training corpus in the first place. Roblox's systems ingested and parsed the Objaverse annotation records—including the creator and license fields—to identify, locate, download, and track the works, and parsed model files whose embedded "asset" metadata identified each work's title, author, license, and source. Roblox's systems thus read the works' CMI at the acquisition and processing stages, used the portions of that metadata that served Roblox's engineering purposes, and omitted from the training corpus the fields recording each work's creator, title, license terms, and usage restrictions. Roblox has confirmed that it examines the provenance of its training data. It states publicly that its training data "may include data subject to third party intellectual property rights" and that "Roblox conducts diligence on training data, including from third-party sources."[8]

[8] Roblox, *AI Data Sharing*, Roblox Creator Hub Documentation, available at: https://create.roblox.com/docs/ai-data-sharing.

114. The copies from which Roblox's pipeline removed CMI were the works themselves. The files Roblox downloaded were identical to the files distributed for download of the works—for Sketchfab works, the files Sketchfab generated—with the CMI conveyed within and alongside each file intact. Roblox's systems held those identical copies, read their CMI, and then removed that CMI from them as it converted them into training copies, keeping records of them from which it was likewise absent. The removal occurred within Roblox's pipeline, on Roblox's own copies of the works, at the moment each file was loaded—before any rescaling, sampling, or rendering of the work's content. It was not a consequence of any later transformation of the works' content but of Roblox's decision to carry that content forward without the information that identified it.

115. Roblox did not create new works at this stage; it worked on existing copies of the works. The files Roblox obtained were copies of the works—material objects in which the works were fixed—and the CMI at issue was conveyed in connection with those copies: within each Sketchfab file's asset header, in the records that accompanied and identified each file, and through the source-page link recorded in both. Roblox's pipeline opened each of those copies, read the header and records in which its CMI resided, and stripped that information out as it converted the copy into the forms its training used. What emerged was the same work in another form—the same expressive content, geometry, and appearance—minus its CMI. The pipeline did not learn from the works and generate new objects at this stage; it took existing copies that carried CMI and carried them forward without CMI. Nor was the works' CMI a visual feature of the models that a particular rendering angle might leave out of frame; it was machine-readable information attached to each copy and its records, which Roblox's pipeline read and was configured to remove.

116. Roblox's data infrastructure created and maintained per-work records about the very works at issue—including identifiers and source locations used to acquire and track objects, and the multiple rendered views and text captions Roblox generated for each of them—while the training records Roblox created omitted the adjacent CMI fields recording authorship and license. Roblox defined the schema of its own training records: it selected which per-work fields its corpus would keep and which it would discard. The fields Roblox kept were those useful to model training and corpus management. The

fields Roblox discarded were those that identified the works' creators and the legal restrictions on the works' use.

117. The omission of CMI from Roblox's training corpus was therefore an avoidable design choice, not an inherent or necessary feature of machine-learning training. The works' CMI was conveyed in machine-readable form within the model files, within the dataset records Roblox's systems read, and, for works obtained from Sketchfab directly, within the download packaging. The formats and record structures Roblox used and created were capable of carrying that information forward, and doing so would have imposed no meaningful burden. The header of a model file is plain text in a documented structure; preserving its creator, license, title, and source fields requires only a few lines of code that read those fields from the header and write them to the training record. The library Roblox chose parses the header but returns only the geometry and, at most, a few generic technical details, and Roblox wrote nothing to capture the rest. Roblox configured its systems to extract and carry forward the works' expressive content—their geometry, structures, textures, and visual features—and other metadata useful to Roblox, while stripping out the CMI that those same sources conveyed. Roblox thereby removed CMI that its systems could have preserved. Nothing about Roblox's use of the works' geometry required disturbing the file header in which their CMI resided; that information could have remained where it was, or been carried forward in the records Roblox created, at no cost to the training process. Rendering a mesh reads the model's geometry and visual resources; nothing in that operation requires stripping the dataset record from which the model was identified and retrieved, or the file header in which the model's CMI resides. Roblox stripped them nonetheless.

118. Because Roblox configured its training pipeline to remove CMI, neither Roblox's training systems nor those systems' users can identify the creator of any given work or comply with the attribution requirements or licensing conditions associated with that work. That incapacity is a condition of Roblox's own making. It results from Roblox's configuration choices, not from any technical constraint of AI machine-learning training.

119. Roblox knew that its preprocessing pipeline, as Roblox designed and configured it, would separate the creative content of the works from the CMI that accompanied them. That separation was the

foreseeable result of Roblox's own configuration choices—and it was avoidable at negligible cost, because the CMI was conveyed in machine-readable form within and alongside the works and could have been carried forward in Roblox's training records.

~~104.~~120. Roblox knew or had reasonable grounds to know that the preprocessing pipelines used to train its generative AI systems, as Roblox configured them, would separate the creative content of the works from the CMI that accompanied those works when they were originally distributed.

~~105.~~121. Finally, ~~Defendant~~Roblox used these CMI-stripped ~~representations~~copies of Plaintiff's works as inputs to train generative AI systems capable of producing new 3D objects, environments, and digital assets, and integrated those systems into commercial products, developer platforms, and enterprise technologies.

~~106.~~122. Through this process, ~~Defendant uses~~Roblox used Plaintiff's works as inputs to train generative AI systems capable of producing new 3D content but without the necessary creator-identifying information, license terms, or other CMI associated with those works.

~~107.~~123. As a result, ~~Defendant~~Roblox exploited Plaintiff's copyrighted works to train commercial AI systems after removing~~, failing to preserve, or disregarding~~ the copyright management information associated with those works.

G. **~~Defendant's~~Roblox's Commercial Use of Objaverse in Generative 3D Systems**

~~108. In March 2025, Roblox released its generative AI system for 3D object generation known as Cube 3D. According to Roblox's public statements and technical disclosures, Cube 3D was trained on approximately 1.5 million 3D assets, including assets derived in part from the Objaverse dataset.~~

124. ~~Roblox has integrated the Cube 3D model into its developer ecosystem through a Mesh Generation API, enabling automated creation of 3D assets within Roblox's online gaming platform.~~In March 2025, Roblox released its generative AI system for 3D object generation, Cube 3D, which Roblox describes as "a 1.8B parameter foundation model for 3D creation trained on 1.5M 3D assets."[9] Roblox

[9] Roblox, *Introducing Roblox Cube: Our Core Generative AI System for 3D and 4D* (Mar. 17, 2025), available at: https://about.roblox.com/newsroom/2025/03/introducing-roblox-cube; Roblox, *[Beta] Cube 3D Generation Tools and APIs for Creators*, Roblox Developer Forum

published a technical report describing the model, *Cube: A Roblox View of 3D Intelligence*, on March 19, 2025. The report states: "We train our shape tokenizer on roughly 1.5 million 3D object assets that utilize a combination of licensed and public available [sic] datasets (e.g. Objaverse (Deitke, et al., 2023)) as well as the free data assets that are available in Roblox Creator Store that are opted in for training."[10] The Objaverse the report cites is the original Objaverse dataset—the collection of approximately 800,000 works gathered from Sketchfab, every one of which was distributed as a Sketchfab-generated model file carrying its creator's name, license, title, and source in its header.

~~109.~~125. Roblox has integrated Cube 3D into its developer ecosystem. Through the Mesh Generation API—available in Roblox Studio's Assistant and, where a developer enables it, inside Roblox experiences—users generate 3D meshes from text prompts, and meshes generated in Studio are added to the creator's inventory and made accessible through Studio's Toolbox.[11] In 2026, Roblox extended the same model to "4D" generation, which lets players generate functional multi-part objects inside experiences; Roblox reported that players generated more than 160,000 objects during that feature's early-access period alone. In May 2026, Roblox released CubePart, a part-controllable generator built on the same foundation.[12] Roblox's platform supports millions of users and developers and generates substantial revenue through digital content creation and distribution.

~~110.~~126. Roblox's own disclosures thus place it squarely within the source-to-training pipeline alleged here. Objaverse and Objaverse-XL preserved per-file source references, license information, and other CMI associated with the underlying works, including Creative Commons designations and, ~~for certain~~through the recorded Sketchfab~~-hosted works,~~ page address, the means of

(Mar. 20, 2025), available at: https://devforum.roblox.com/t/beta-cube-3d-generation-tools-and-apis-for-creators/3558947.

[10] Cube Report § 2.4.

[11] Roblox, *GenerationService*, Roblox Engine API Reference, available at: https://create.roblox.com/docs/reference/engine/classes/GenerationService.

[12] Roblox, *Accelerating Creation, Powered by Roblox's Cube Foundation Model* (Feb. 4, 2026), available at: https://about.roblox.com/newsroom/2026/02/accelerating-creation-powered-roblox-cube-foundation-model; Yiheng Zhu et al., *CubePart: An Open-Vocabulary Part-Controllable 3D Generator*, (May 27, 2026), available at: https://arxiv.org/abs/2605.28763.

identifying NoAI related restrictions designations. Yet Roblox disclosed no attribution mechanism for underlying creators and no filtering system for non-commercial license restrictions before using those works to train Cube 3D. Roblox's report describes no license-based exclusion criterion of any kind and does not state that creator or license fields were preserved with the selected assets.

111.127. Upon information and belief, Roblox used Objaverse-derived referencesObjaverse's records to identify and obtain copies of 3D models—from the source repositories whereObjaverse collection hosted on Hugging Face, or from the Sketchfab pages to which those works were originally distributed records point—together with the creator-identifying information, license terms, attribution requirements, and other CMI. that those files and records carried. Roblox then copied, converted, loaded, rescaled, sampled, and rendered, normalized, and otherwise processed those works into machine-learning inputs suitable for training Cube 3D, and in that processloading them removed, failed to preserve, or disregarded the CMI that accompanied the works when originally distributed.

112.128. Roblox's commercial use is especially direct. The Cube 3D model is integrated into its revenue-generating Creatordeveloper ecosystem through the Mesh Generation API. In other words, Roblox used works identified through Objaverse to train a commercial generative system while failing to carry forwardafter removing the attribution, license terms, and other CMI that governed those works at the time of publication.

129. Roblox's report describes a second operation performed on every training asset. "For each of the 1.5 million assets used to train the shape tokenizer," Roblox states, "we render multiple views" and "use GPT-4[o] . . . to provide captions of various lengths."[13] GPT-4o is a vision-and-language model developed and operated by OpenAI, a party unrelated to Roblox, and made available to businesses through commercial services. Roblox thus rendered each work in its training corpus from multiple viewpoints, sent those renderings outside Roblox, to the service through which GPT-4o is accessed, and received back text descriptions of the works, which it paired with the works as training data. Roblox rendered those views from copies it had already stripped of CMI, so the renderings carried none of the

[13] Cube Report § 3.1. The report renders the model's name as "GPT-40," an apparent typographical rendering of GPT-4o, and cites OpenAI's GPT-4 technical report.

works' CMI—no title, creator, license, or source—and the captions identify no creator and no license. Roblox therefore handled every work individually, at least twice, and created and kept a new per-work record for each; what it did not keep was the CMI each work arrived with.

130. Roblox knows how to track the provenance and permissions of training data when it chooses to. Roblox operates a program it calls "AI data sharing," under which Roblox decides, item by item, whether content from its own platform may be used to train its generative-AI models. Roblox's published documentation for that program states that the data-sharing setting "is off by default for games, avatar items, and paid assets published prior to July 10, 2024" and "on by default" for those published on or after that date; that creators may "[c]hoose individual games, avatar items, and paid Creator Store assets to share or not share"; that "free Creator Store assets are shared by default, with no ability to disable sharing"; and that "[i]f you share something and then later stop sharing it, Roblox will remove it from the training dataset within 30 days," after which "[a]ny AI models that were trained using your data will be updated within 365 days."[14]

131. A training dataset from which a specific creator's items can be located and removed within thirty days is a dataset that records, for each item, who created it and whether its use is permitted. Roblox built and maintains that record for the works of its own creators. For the Objaverse works—created by Plaintiff and the Class, and delivered to Roblox with the same kind of information inside every file—Roblox stripped all of it from the copies and records it carried forward: creator, license, source, and any NoAI designation. The difference is not one of technical capability. It is a choice about whose rights information Roblox's training records would carry.

132. The same documentation lists the sources of Roblox's generative-AI training data, beginning with "[d]ata from publicly accessible repositories under permissive licenses or released in the public domain," and including "[d]ata provided by annotation services and other contractors."[15] It acknowledges that "[t]raining data may include data subject to third party intellectual property rights,"

[14] Roblox, *AI Data Sharing*, *supra* note 8.

[15] *Id.*

and represents that "Roblox conducts diligence on training data, including from third-party sources."[16] Roblox states that it "started compiling and using datasets for generative AI systems in 2023," and that "[s]uch use is ongoing."[17] Diligence on the license status of a publicly accessible repository of 800,000 works whose licenses vary work by work requires reading the per-work license records that accompany those works. Roblox read them, and then wrote training records without them.

133. Roblox also understood that a generative 3D model can reproduce the works on which it was trained. In announcing Cube 3D, Roblox told its developer community, in the FAQ section, that it uses "output filters to reduce the likelihood that Cube 3D generates content that is similar to copyrighted works," and that its "Rights Manager allows creators to report content they believe is copyright infringing and file a removal request."[18] Published empirical research confirms the concern: generative 3D shape models memorize and reproduce shapes from their training data, and memorization increases with data diversity and finer-grained conditioning.[19] A model that reproduces a training work with its CMI attached reveals its source. A model trained on CMI-stripped copies does not. These allegations go to Roblox's knowledge and to the concealment of infringement.

134. Roblox assembled and processed its Cube 3D training corpus after February 2023, when Sketchfab announced the NoAI designation; after March 23, 2023, when Sketchfab's updated Terms of Use took effect prohibiting the use of NoAI-designated models in datasets for, in the development of, or as inputs to generative AI programs; and after the presence of NoAI-designated works in Objaverse had been publicly reported and protested by creators. By Roblox's own account, it began compiling datasets for generative AI in 2023. By then, the removal of rights-management information from AI training data was the subject of widely publicized litigation in this District.

---

[16] *Id.*

[17] *Id.*

[18] *See supra* note 9.

[19] *See* Shu Pu et al., *Memorization in 3D Shape Generation: An Empirical Study*, (Dec. 29, 2025), available at: https://arxiv.org/abs/2512.23628.

135. Roblox's exploitation of this training corpus is ongoing and commercial. Roblox released the Cube 3D model weights and inference code (neither of which is a training manifest, dataset list, or per-asset record sufficient to identify individual works) to the public on GitHub and Hugging Face in March 2025, released updated weights trained on the same foundation in July 2025, and released the CubePart model in May 2026. Roblox operates a public web demonstration through which members of the public generate 3D models from text prompts, and through the Mesh Generation API it delivers generated meshes to creators' inventories and into Roblox experiences on a platform that generates substantial revenue from user-created content.

136. The allegations in this Complaint made on information and belief rest on, among other sources: Roblox's technical report describing Cube 3D and the data on which it was trained; Roblox's public announcements of Cube 3D and its successors; the model weights and inference code Roblox publicly released, including the code Roblox published that prepares a model file for its shape tokenizer; Roblox's published documentation of its AI data-sharing program and of the Mesh Generation API; the Objaverse and Objaverse-XL research papers, documentation, annotation records, and download software; the Objaverse collection and metadata hosted on Hugging Face; the glTF 2.0 specification; Sketchfab's published announcements, terms of use, and model pages; and counsel's examination of the model files, dataset records, and web pages described above. The remaining facts—the configuration of Roblox's training pipeline and the contents of its data infrastructure—are within Roblox's exclusive possession and are not available to Plaintiff before discovery.

**H. Roblox's Intentional Removal of CMI**

137. Roblox's removal of CMI was intentional. It was not an accident, an oversight, or the unavoidable byproduct of a process indifferent to CMI. As alleged above: (i) Roblox's systems read the works' CMI and used it to identify, acquire, and track the works, and Roblox represents that it conducts diligence on the provenance of its training data; (ii) Roblox selectively preserved the per-work information useful to its engineering purposes—identifiers, rendered views, and captions—while discarding the adjacent fields identifying each work's creator and license; (iii) Roblox defined the schema of its own training records to exclude those fields, even as it maintained item-level creator and permission

records for the training data drawn from its own platform; (iv) Roblox's published code shows a loading step that reads a model file's header, carries forward its geometry (and, in current versions of the library, a few generic technical fields the library supplies itself), and strips out the creator, license, title, and source information the header carried; and (v) Roblox declined feasible, cost-free, information-preserving alternatives that were before it in the very dataset and file formats it used. Roblox's pipeline singled out and excised CMI while leaving the works themselves intact.

138. Section 1202(b) of the DMCA provides that "[n]o person shall, without the authority of the copyright owner or the law—(1) intentionally remove or alter any copyright management information . . . knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b).

139. The statute requires that removal of CMI be intentional—deliberate rather than accidental or inadvertent—and, separately, that the defendant know or have reasonable grounds to know that the removal will induce, enable, facilitate, or conceal infringement. Where Congress required conduct undertaken for a particular purpose, it said so expressly in the adjoining subsection: § 1202(a) reaches only conduct undertaken "knowingly and with the intent to induce, enable, facilitate, or conceal infringement." Section 1202(b)(1) contains no such clause. A defendant that deliberately removes CMI acts within the statute's terms whether or not suppressing CMI was its ultimate objective, so long as the statute's knowledge element is satisfied—as this Complaint alleges it is.

140. Roblox's removal of CMI also served a concealment function that Roblox understood. Retaining per-work attribution and license information in a training corpus creates records tying a developer's systems to identifiable creators' works and to identifiable license restrictions—records that platform operators, creators, litigants, and courts can later examine—and increases the risk that a generative model will reproduce attribution information in its outputs, revealing the sources of its training data. Removing that information reduces the traceability of the training corpus and obscures both the identity of the works used and the restrictions that governed them. Roblox's public description of Cube 3D's training data illustrates the point. It discloses that Roblox trained on 1.5 million assets drawn in part

from Objaverse, but identifies no work, no creator, and no license, and nothing Roblox has preserved or disclosed would allow a creator to learn that his work was among them. Plaintiff learned that his works had been swept into the dataset Roblox used only through search tools offered by the website hosting that dataset, not from any record Roblox kept. Upon information and belief, and based on the facts alleged above, Roblox omitted CMI from its 3D training corpus in part to reduce the traceability of its training data and to conceal the identity and license status of the works it used.

141. Plaintiff does not allege that machine-learning training inherently or necessarily severs works from their CMI, nor that liability arises from format conversion as such. Plaintiff alleges that Roblox built and operated a data pipeline that read the works' CMI, could have preserved that CMI at negligible cost, preserved other per-work information instead, and wrote training copies and records from which the CMI was missing while the fields Roblox needed were retained. The absence of CMI from Roblox's training corpus is the result of Roblox's choices about what to keep and what to discard.

**~~H.~~I. Plaintiff Suffered Harm and Concrete Injury**

~~113.~~142. -As a professional artist and creator of photogrammetry-based[20] 3D models, Plaintiff has invested substantial time, skill, and financial resources in developing his professional practice.

~~114.~~143. These investments include professional-grade camera equipment, drones, specialized computing hardware capable of processing large photogrammetry datasets, and licensed software used to reconstruct and refine three-dimensional models from Plaintiff's original photographic inputs. Plaintiff has also invested substantial time and labor in capturing imagery, processing scans, editing meshes and textures, and preparing models for distribution on online platforms.

[20] Photogrammetry is a specialized technique that involves capturing large numbers of high-resolution photographs of real-world objects and environments and processing those images through specialized software in order to reconstruct accurate digital three-dimensional assets.

~~115.~~144. Since approximately 2018, Plaintiff has created and published hundreds of original 3D models through various online platforms used by the global 3D artist community. These platforms include Sketchfab, CGTrader, Thingiverse, and Polycam.

~~116.~~145. On Sketchfab alone, Plaintiff has published more than four hundred original 3D models which are displayed and distributed through an integrated online viewer that allows users to evaluate the models. Plaintiff's models have collectively received more than 600,000 views on Sketchfab ~~alone~~. At the time Plaintiff published his models on Sketchfab, he conveyed his restrictions on their use ~~with the CC-BY (attribution)~~through Creative Commons licenses—principally the CC BY (Attribution) license and, for some works, the CC BY-NC-SA and CC BY-SA licenses.

~~117.~~146. Plaintiff's professional practice has historically depended on public visibility of his published works. Plaintiff used Sketchfab as a central portfolio through which potential clients—including artists, developers, and commercial entities—could discover his work, evaluate its quality, and engage him for purchase, licensing opportunities, or additional freelance projects.

~~118.~~147. Prior to the emergence of generative artificial intelligence systems trained on large-scale 3D datasets identified herein, Plaintiff regularly received economic opportunities from this portfolio-based model. Plaintiff sold and licensed models through the Sketchfab marketplace and other platforms and used his publicly available work to obtain freelance opportunities in visual effects and related fields. For example, Plaintiff was engaged to perform 3D scanning work for artistic and commercial projects after clients discovered his work through his online Sketchfab portfolio.

~~119.~~148. In addition to publishing models for portfolio visibility and community collaboration, Plaintiff has also monetized his work through licensing and marketplace sales. Plaintiff has sold and licensed his models through digital asset marketplaces such as CGTrader and through Sketchfab's integrated marketplace. Plaintiff has also negotiated direct licenses with companies seeking to incorporate his models into their own digital products and services.

~~120.~~149. Attribution plays a critical role in Plaintiff's ability to generate income from his work. Plaintiff's use of Creative Commons attribution licenses was intended to allow his models to be shared while ensuring that his identity remained associated with the works, thereby enabling prospective

clients to locate his portfolio and engage him for paid opportunities. Plaintiff has, in fact, received professional credit for his work, including attribution in connection with third-party projects, which contributes to his reputation and visibility within the industry.

~~121.~~150. Recognizing the importance of this attribution-based model, Plaintiff has in the past actively ~~pursued~~policed unlawful redistribution and copying of his work, including by issuing ~~Digital Millennium Copyright Act~~DMCA takedown notices after discovering that third parties had reproduced or redistributed his models without permission.

~~122.~~151. Plaintiff has also utilized tools available on hosting platforms, such as Sketchfab, designed to communicate restrictions on the use of his works in automated data collection or artificial intelligence systems.

~~123.~~152. For example, shortly after Sketchfab introduced a "NoAI" designation in February 2023, Plaintiff manually applied the NoAI tag to each of the more than four hundred models published on the site. This action reflected Plaintiff's explicit decision to prohibit the use of his works for generative AI training purposes.

~~124.~~153. Despite these steps, shortly after applying the NoAI designation on his works hosted on Sketchfab, Plaintiff discovered that his works were referenced within the Objaverse dataset. The website hosting the Objaverse dataset provided tools allowing creators to search for models associated with their accounts. Using those tools, Plaintiff located numerous works of his within the dataset.

154. The dataset's own records confirm that Plaintiff's works are among the Sketchfab works in Objaverse, and that they were indexed together with their CMI. A review of the 798,759 records that make up the Objaverse collection—the Sketchfab component of Objaverse-XL—for Plaintiff's Sketchfab account identified 243 works that Plaintiff created and published between March 2018 and July 2022. For each of those works, the corresponding record names Plaintiff's account and display name, links to his profile, states the Creative Commons license he selected for the work, and designates the work as downloadable. As captured in the dataset, 213 of those works were licensed CC BY 4.0, 29 were licensed CC BY-NC-SA 4.0, and one was licensed CC BY-SA 4.0. The model files for representative

works of Plaintiff, retrieved through the dataset's own software, carry in their headers Plaintiff's name, a link to his Sketchfab profile, and the applicable Creative Commons license.

155. Roblox has stated that it trained Cube 3D on roughly 1.5 million assets drawn from Objaverse, among other sources, but it has not disclosed which Objaverse works it used. Upon information and belief, Plaintiff's 243 works in Objaverse, or at least some of them, were among the assets Roblox used. That allegation rests on Roblox's identification of Objaverse by name as a source; on the number of Plaintiff's works in Objaverse—243 of approximately 800,000—such that, unless Roblox's selection systematically excluded Plaintiff's works, even a small selection rate makes it highly probable that at least some of them were used; on the character of Plaintiff's works—textured, artist-authored photogrammetry models of the kind a quality filter would retain rather than discard; and on Roblox's exclusive possession of the list of assets it used. Roblox's report describes no selection criterion that would have excluded Plaintiff's works, and given the number of Plaintiff's works in the dataset, it is implausible that Roblox's selection missed all of them. In selecting and processing those works, Roblox encountered the work-specific attribution and license information described above in the records and files from which it obtained them, and carried the works' content into its training corpus without it.

~~125.~~156. Plaintiff raised concerns regarding this issue with individuals at Sketchfab and publicly objected to the inclusion of his works within AI-related datasets despite the NoAI restrictions he had applied to his models. Plaintiff was informed that Sketchfab had limited ability to prevent entities from copying and using the models once they had been indexed or collected by third-party datasets.

~~126.~~157. As a result of these developments, Plaintiff took steps to restrict access to his works. Plaintiff removed the free-download availability of his models and moved many of his works into the paid marketplace in an effort to prevent further ingestion of his works into AI training datasets. This shift has reduced the visibility and accessibility of Plaintiff's work within the broader creative community and has thus diminished the portfolio-driven exposure that previously generated business opportunities.

~~127.~~158. The events described above have also had a significant personal impact on Plaintiff. Upon learning that his works had been incorporated into datasets used to train generative artificial intelligence systems, against his explicit wishes, Plaintiff felt that the value of his creative labor

had been appropriated without permission. Plaintiff experienced a loss of creative motivation to continue producing and sharing new models at the pace he had previously maintained. As a result, Plaintiff reduced the frequency with which he created and uploaded new works.

128.159. Taken together, Defendant'sRoblox's conduct of removing, failing to preserve, or disregarding CMI—including attribution and licensing terms—interferes directly with the attribution-based economic model for Plaintiff and Class Members. DefendantRoblox has undermined the licensing framework that governed Plaintiff's models and interfered with Plaintiff's and Class Member'sMembers' ability to control how their works are used, attributed, and monetized.

129.160. Defendant'sRoblox's conduct has therefore diminished the value of Plaintiff's creative works, disrupted the market for licensing 3D assets, and interfered with Plaintiff's ongoing efforts to build and sustain a professional practice based on the creation and licensing of digital 3D models.

**CLASS ACTION ALLEGATIONS**

130.161. **Class Definition:** Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as follows: (the "Class"):

> All creators whose 3D models with CMI were published on Sketchfab, Thingiverse, Polycam, or other repositories and were incorporated into Objaverse, Objaverse-XL, or derivative datasets used by DefendantRoblox to train its AI models during the Class Period.

131.162. Plaintiff reserves the right to modify the class definitionsdefinition or add sub-classes as needed prior to filing a motion for class certification.

132.163. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgementjudgment or preliminary approval of a settlement.

133.164. Excluded from the Class are DefendantRoblox; any affiliate, parent, or subsidiary of DefendantRoblox; any entity in which DefendantRoblox has a controlling interest; any officer, director, or employee of DefendantRoblox; any successor or assign of DefendantRoblox; anyone

employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

134.165. Numerosity/Ascertainability. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.impracticable. The exact number of Class Members is unknown to Plaintiff currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable. Datasets such as Objaverse-XL preserve certain metadata, including references to the original source repositories and model URLs from which the assets were collected, enabling the models referenced in the dataset to be traced back to the specific platform pages where the works were hosted. Those platform pages identify the creator of the work. As a result, the creators whose works were referenced in Objaverse-derived datasets—including Plaintiff and members of the proposed Class—can be identified through systematic analysis of the dataset metadata and the corresponding source repositories.

135.166. Typicality. Plaintiff's claims are typical of the claims of the Class because Plaintiff's 3D Modelsmodels were included in the datasets used by DefendantRoblox in the training of Defendant'sRoblox's AI models. DefendantRoblox trained commercial generative AI systems on Plaintiff's 3D models after removing the copyright management information that accompanied those works. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

136.167. Adequacy. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests coincide with, and are not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

137.168. Common Questions of Law and Fact Predominate. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because DefendantRoblox has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant'sRoblox's wrongful conduct. The following questions of law and fact are common to the Class:

(a) Whether DefendantRoblox used datasets derived fromObjaverse, Objaverse-XL, or related datasets to identify and obtain 3D models created by Plaintiff and members of the Class.

(b) Whether the works created by Plaintiff and members of the Class were originally distributed on platforms such as Sketchfab, Thingiverse, or Polycam together with copyright management information, including creator attribution, licensing terms, and conditions governing reuse.

(c) Whether the information accompanying those works—including creator identity, license designations, attribution requirements, and related metadata—constitutes copyright management information under 17 U.S.C. § 1202.

(d) Whether DefendantRoblox copied or obtained Plaintiff's and Class Members' works for use in training generative artificial intelligence systems.

(e) Whether, in the course of copying, converting, rendering, preprocessing, or ingesting those works into its AI training pipeline, DefendantRoblox removed, or altered, or failed to preserve the copyright management information associated with those works.

(f) Whether DefendantRoblox knew, or had reasonable grounds to know, that the removal or failure to preservealteration of copyright management information would induce, enable, facilitate, or conceal infringement within the meaning of 17 U.S.C. § 1202(b).

(g) Whether Defendant'sRoblox's conduct violated 17 U.S.C. § 1202.

(h) Whether Plaintiff and Class membersMembers are entitled to declaratory and injunctive relief requiring DefendantRoblox to cease training its commercial generative AI systems using Plaintiff's works, which it stripped of copyright management information, and to implement compliance measures sufficient to prevent further violations.

(i) Whether Plaintiff and Class membersMembers are entitled to statutory damages (including the appropriate statutory measure and amount) under 17 U.S.C. § 1203(c) based on Defendant'sRoblox's violations of 17 U.S.C. § 1202.

138.169. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary

duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially ~~outweighs~~outweigh potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Digital Millennium Copyright Act
### 17 U.S.C. § 1202(b)(1)
### (Removal of ~~Copyright Management Information~~CMI from Copies of Existing Works at the Input Stage)

~~139.~~170. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

~~140.~~171. Plaintiff and members of the proposed Class are creators of original 3D models that are distributed on public repositories including, but not limited to, Sketchfab, Thingiverse, and Polycam.

~~141.~~172. When distributed on those platforms, the works were accompanied by ~~copyright management information (“~~CMI~~”),~~, including the creator’s identity, the title of the work, licensing terms governing reuse, attribution requirements, and other information identifying the conditions under which the work could be used.

~~142.~~173. This information was conveyed in connection with copies of the works and constitutes copyright management information within the meaning of 17 U.S.C. § 1202(c).

~~143.~~174. ~~Defendant~~Roblox used ~~datasets derived from~~Objaverse, Objaverse-XL, or related datasets to identify and obtain copies of Plaintiff’s and Class ~~members’~~Members’ works from the repositories where those works were originally hosted, or from hosted copies of those works, including the Objaverse collection hosted on Hugging Face.

~~144.~~175. ~~Defendant~~Roblox then copied and processed those works through machine-learning preprocessing pipelines ~~designed~~that Roblox built to convert ~~raw~~copies of 3D ~~assets~~works into

inputs suitable for training generative artificial intelligence systems and configured to strip the works' CMI.

176. ~~These~~Count I is a claim about Roblox's treatment of copies of existing works at the input stage of training: it challenges Roblox's removal of CMI from the copies of Plaintiff's and Class Members' works that Roblox obtained and loaded in the course of preparing them for training, before any model was trained. It is an input-stage claim and is pleaded as such; it does not depend on the content of any output of Cube 3D. The Ninth Circuit has explained that "remove" and "alter" "imply taking an affirmative act with respect to CMI connected to a work that already exists," and that CMI is information conveyed in connection with copies, meaning material objects in which a work is fixed. *Doe 1 v. GitHub, Inc.*, No. 24-7700, 2026 WL 2728464, *5 (9th Cir. Sept. 16, 2026). Among the paradigmatic violations the court identified is deleting "the electronic information that may accompany a computer file." *Id.* at *5. That is what Roblox did. Where the copy a defendant loaded differs from the original only in that its CMI is missing, a factfinder may reasonably infer that the defendant removed it. *Id.* at *6 ("[I]f the two works are otherwise identical—sharing, for example, the same composition, cropping, or other distinctive features—but the allegedly infringing version omits the CMI that accompanied the original, a factfinder may reasonably infer that the defendant removed CMI from the copied work.") (citing *Friedman v. Live Nation Merchandise, Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016)).

~~145.~~177. Roblox configured its preprocessing ~~operations—including format conversion—~~loading, mesh cleaning, normalization, surface sampling, rendering, ~~voxelization,~~ and related ~~transformations—separate~~operations—to carry forward the expressive content of ~~the~~each work ~~from~~without the attribution information, licensing metadata, and other CMI ~~associated with~~conveyed within and alongside the work ~~when~~as originally distributed. The removal occurred at the first of those operations: the load step read each file's header but kept only the geometry (and, in current versions of the library, a few generic technical fields it supplies itself), so the CMI the header carried was discarded before any other processing took place. The later operations worked from copies already stripped of CMI. Nothing in the preprocessing Roblox has published preserves that information or records it elsewhere. The operations Roblox selected preserved the works' geometry, structures, textures, and visual features

essentially in full, and preserved other per-work information useful to Roblox, while excising the information identifying each work's creator and license.

~~146.~~178. ~~Through this process, Defendant~~At the loading step alleged above, Roblox intentionally removed~~, altered, or caused~~ CMI from the ~~removal or alteration~~copies of ~~CMI associated with~~ the works it obtained, including creator attribution, licensing terms, and other identifying information.

179. ~~Defendant~~Roblox's removal and alteration of CMI was intentional within the meaning of 17 U.S.C. § 1202(b)(1). It was the product of deliberate design, configuration, and curation choices—alleged above—by which Roblox's systems read the works' CMI, preserved the works' expressive content and the per-work information useful to Roblox, and stripped the works' CMI from the copies Roblox processed for training and from the records Roblox kept of them, notwithstanding feasible and cost-free means of preserving it. Roblox's removal of CMI was not accidental or inadvertent, and it was not the necessary byproduct of any format constraint.

~~147.~~180. Roblox then incorporated these CMI-stripped ~~representations~~copies of Plaintiff's works into the training datasets used to develop its generative artificial intelligence systems.

~~148.~~181. ~~Defendant~~Roblox knew, or had reasonable grounds to know, that the works referenced in Objaverse and Objaverse-XL originated from platforms such as Sketchfab, Thingiverse, and Polycam that distribute user-generated models together with creator attribution, license designations, and other CMI governing downstream use.

~~149.~~182. ~~Defendant~~Roblox further knew, or had reasonable grounds to know, that the preprocessing pipelines used to train generative AI systems ~~do not preserve~~, as Roblox configured them, strip such CMI from the copies they process and ~~instead~~ produce normalized representations of the works ~~that omit~~from which attribution, licensing metadata, and other rights-management information has been removed.

~~150.~~183. By removing ~~or failing to preserve~~ this information ~~during~~at the ~~training process, Defendant~~input stage, Roblox ensured that neither the resulting AI systems nor their users could identify

the creators of the underlying works or comply with the license conditions governing those works, including attribution requirements and restrictions on commercial use.

184. ~~Defendant~~The infringement that Roblox's removal of CMI enabled, facilitated, and concealed is identifiable. In downloading and storing the works, Roblox reproduced them, 17 U.S.C. § 106(1); in loading, normalizing, sampling, and rendering them into training representations, Roblox reproduced them again in other forms, id.; and Roblox did so for a purpose the works' licenses withheld. Works licensed on condition of attribution could not be used without it; works licensed for non-commercial use could not be used to build commercial products; and, to the extent works bore the NoAI designation when Roblox acquired and processed them, they could not be used in AI datasets or training at all. Plaintiff's works in Objaverse include 213 licensed CC BY 4.0, on condition of attribution, and 29 licensed CC BY-NC-SA 4.0, for non-commercial use only. A licensee that uses a work beyond the scope of its license infringes the copyright in that work. Roblox's own copying and use of the works, on terms their licenses did not permit, is the infringement to which Roblox's knowledge attaches—and it is infringement that the removal of each work's CMI made undetectable.

185. Had the works' CMI traveled with them into Roblox's training records, the consequences would have been concrete. Roblox's pipeline already handled the works one by one—loading, cleaning, rescaling, sampling, rendering, and captioning each of them—and a recorded license field, NoAI designation, or source link would have been available to any filter, any reviewer, and any subsequent audit, marking each restricted work for exclusion or compliance. Roblox acts on such signals when it records them: it honors item-level data-sharing settings for the works of its own creators, removes their content from its training dataset on request, and configures the output filters of its models for similarity to copyrighted works. With the CMI removed, no filter could exclude restricted works, no reviewer could identify them, and no creator could learn that his work had been used.

~~151.~~186. Roblox therefore knew, or had reasonable grounds to know, that the removal or alteration of CMI would induce, enable, facilitate, or conceal infringement of Plaintiff's and Class ~~members'~~Members' works.

~~152.~~187. As a direct and proximate result of ~~Defendant's~~Roblox's conduct, Plaintiff and members of the proposed Class have suffered injury.

~~153.~~188. Each work from which CMI was removed or altered constitutes a separate violation of 17 U.S.C. § 1202(b)(1).

~~154.~~ Pursuant to 17 U.S.C. § 1203, Plaintiff and the Class are entitled to recover actual damages and ~~Defendant's profits attributable to the violations, or statutory damages for each violation, together with costs and attorneys' fees.~~

~~155. Plaintiff and the Class are further entitled to injunctive and equitable relief prohibiting Defendant from continuing to remove, alter, or distribute works from which copyright management information has been removed.~~

**~~COUNT II~~**
**~~Violation of the Digital Millennium Copyright Act~~**
**~~17 U.S.C. § 1202(b)(3)~~**
**~~(Distribution or Use of Works Knowing CMI Has Been Removed)~~**

~~156. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.~~

~~157. Section 1202(b)(3) prohibits any person from distributing, importing for distribution, or otherwise using copyrighted works knowing that copyright management information has been removed or altered without authority.~~

~~158. As described above, Plaintiff's and Class members' works were originally distributed together with CMI identifying the creator of the work, the title of the work, and the licensing terms governing reuse.~~

~~159. This information constitutes CMI within the meaning of 17 U.S.C. §1202(c).~~

~~160. Defendant used datasets derived from Objaverse-XL, or related datasets to identify and obtain copies of Plaintiff's works from the repositories where those works were originally hosted.~~

~~161. In the course of copying, converting, rendering, normalizing, and otherwise preprocessing those works for use in AI training pipelines, the CMI associated with the works was removed, altered, or failed to be preserved.~~

162. Defendant thereafter used, distributed, and incorporated these CMI-stripped representations of Plaintiff's works within the training datasets used to develop its generative artificial intelligence systems.

163. Defendant knew, or had reasonable grounds to know, that the CMI associated with those works had been removed or altered without the authority of the copyright owners.

164. Defendant further knew, or had reasonable grounds to know, that the use of works from which CMI had been removed would induce, enable, facilitate, or conceal infringement of Plaintiff's and Class members' works.

165. By using and incorporating these works into its generative AI training datasets and systems, Defendant violated 17 U.S.C. §1202(b)(3).

166. As a direct and proximate result of Defendant's conduct, Plaintiff and members of the proposed Class have suffered injury.

167.189. Pursuant to 17 U.S.C. §1203, Plaintiff and the Class are entitled to recover actual damages and Defendant'sRoblox's profits attributable to the violations, or statutory damages for each violation, together with costs and attorneys' fees.

168.190. Plaintiff and the Class are further entitled to injunctive and equitable relief prohibiting DefendantRoblox from continuing to useremove or distribute works from whichalter copyright management information has been removedconveyed with Plaintiff's and Class Members' works.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that the Court grant the following relief:

(a) Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

(b) A declaration that DefendantRoblox violated 17 U.S.C. § 1202(b)(1) and § 1202(b)(3) by intentionally removing or altering copyright management information associated with Plaintiff's and

Class Members' works and by distributing, using, or incorporating works knowing that such copyright management information had been removed or altered;

(c) Entry of injunctive relief requiring DefendantRoblox to cease removing, or altering, or failing to preserve copyright management information fromconveyed with works obtained for use in generative artificial intelligence training systems;

(d) Entry of injunctive relief prohibiting DefendantRoblox from distributing, using, or incorporating into artificial intelligence training datasets any copies of Plaintiff's and Class Members' works from which Roblox removed copyright management information has been removed or altered in violation of the DMCA;17 U.S.C. § 1202(b)(1);

(e) An order requiring DefendantRoblox to identify and account for the works of Plaintiff and members of the Class that were incorporated into datasets or training pipelines used to develop Defendant'sRoblox's generative artificial intelligence systems;

(f) Entry of injunctive relief requiring DefendantRoblox to preserve copyright management information associated with works used in future AI training datasets and to implement compliance measures sufficient to prevent further violations of 17 U.S.C. § 1202;

(g) An award of statutory damages and/or actual damages and Defendant'sRoblox's profits attributable to the violations pursuant to 17 U.S.C. § 1203;

(h) An award of Plaintiff's and the Class's reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 1203(b)(4)-(5);

(i) Pre- and post-judgment interest as permitted by law; and

(j) Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all the claims asserted in this Complaint so triable.

Date: March 26November 2, 2026 Respectfully Submitted,

*/s/ William J. Edelman*
William J. Edelman (SBN 285177)
~~Gary M. Klinger (*pro hac vice* forthcoming)~~
**MILBERG, PLLC**
~~227 W. Monroe Street, Suite 2100~~
~~Chicago, IL 60606~~
~~Phone~~280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel: (771) 474-1121
wedelman@milberg.com

Gary M. Klinger (admitted *pro hac vice*)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Michael A. Acciavatti (admitted *pro hac vice* ~~forthcoming~~)
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel: (212-) 594.-5300
macciavatti@milberg.com